IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

EDWARD ELLIS, JR., et al.,

           Plaintiffs,

v.                                        CIVIL ACTION NO.   5:15-cv-16228

PINNACLE MINING COMPANY,
LLC, et al.,

           Defendants.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Defendant Pinnacle Mining Company, LLC's Motion for Summary Judgment* (Document 94) and *Memorandum of Law in Support* (Document 95), the *Plaintiffs' Response in Opposition to Defendant, Pinnacle Mining Company's Motion for Summary Judgment* (Document 125) and *Memorandum in Support* (Document 126), and *Defendant Pinnacle Mining Company, LLC's Reply to Plaintiff's Response in Opposition to Defendant Pinnacle Mining Company's Motion for Summary Judgment* (Document 150).   In addition, the Court has reviewed the Plaintiffs' *Motion for Leave to File Surreply in Opposition to Pinnacle Mining Company, LLC's Motion for Summary Judgment* (Document 151).   The Court has further reviewed all attached exhibits.

The Court has also reviewed the *Plaintiffs' Motion for Partial Summary Judgment on the Issue of Liability for Deliberate Intent* (Document 102) and *Memorandum of Law in Support* (Document 103), the exhibits attached to Document 104, *Defendants Cliffs Natural Resources,*

*Inc., Cliffs North American Coal LLC, Cliffs Logan County Coal LLC, Cliffs West Virginia Coal Inc., and Cliffs Mining Services Company LLC's Response in Opposition to Plaintiffs' Motion for Partial Summary Judgment* (Document 124), *Defendant Pinnacle Mining Company, LLC's Response to Plaintiffs' Motion for Partial Summary Judgment* (Document 129), and all attached exhibits. For the reasons stated herein, the Court finds that both motions for summary judgment should be denied.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Plaintiffs, Edward Ellis and his wife, Tina Ellis, initiated this action in the Circuit Court of Wyoming County on August 3, 2015. They named as Defendants Pinnacle Mining Company, LLC (Pinnacle), Cliffs Natural Resources Inc., Cliffs North American Coal LLC, Cliffs Logan County Coal, LLC, Cliffs West Virginia Coal Inc., and Cliffs Mining Services Company (collectively, "Cliffs Defendants").[1] The Defendants removed the matter to federal court on December 17, 2015, asserting diversity jurisdiction. The Plaintiffs filed an *Amended Complaint* (Document 18) on January 20, 2016, asserting the following causes of action: (1) Deliberate Intent – Pinnacle; (2) Unsafe Workplace/Negligence – Cliffs Defendants; (3) Deliberate Intent – Cliffs Defendants; (4) Loss of Consortium – all Defendants, on behalf of Tina Ellis.

Mr. Ellis was employed by Pinnacle as a general laborer at Pinnacle Mine, beginning in April 2013. He had over twenty years of mining experience, and had attained various certifications over the years, including his foreman certification. He was hired as an hourly employee on the evening shift, and worked on the longwall, as a general laborer wherever he was

---

[1] Pinnacle is a subsidiary of Cliffs North American Coal LLC, which is a subsidiary of CLF Pinnoak LLC, which is in turn a subsidiary of Cliffs Mining Company. Cliffs Natural Resources, Inc., is the ultimate parent company.

2

assigned, or filled in as a fireboss if needed.  Pinnacle provided him with newly employed experienced miner training when he began, as well as task training when he was assigned new tasks.  The training included some discussion of appropriate protective gear, as well as safety instructions for passengers on mantrips traveling in the mine.  Those instructions specify that, if the pole detaches, passengers should not rise up or attempt to grab it until the mantrip has fully stopped, and that passengers should not rise up and should keep all limbs inside the mantrip.  In addition to the formal training, Pinnacle supervisors held safety meetings before each shift to discuss general safety protocol as well as any violations or issues management had noticed.

On August 3, 2013, while riding the mantrip at the beginning of his shift, Mr. Ellis hit his head on a roof bolt and was seriously injured.  He lost consciousness, and the impact broke through his hardhat.  He recalls the impact pushing his head down and back.  He suffered injury to his cervical spine, which left him with little feeling in his legs, reduced control of his arms, bowel and bladder dysfunction, and sexual dysfunction.  Though he can walk very short distances with a walker, he is unsteady and at risk of falling.  Mr. Ellis will need a wheelchair for the rest of his life due to his injuries, and will always need someone to assist him with personal hygiene, eating, and other aspects of daily life.  His wife currently acts as his caregiver.

The accident took place near Break 142 in the mine, about forty minutes from the mine entrance.  Mr. Ellis had been doing rehab work for two to four weeks to prepare an area to have seals put in, and had travelled the same route during that time.  A small number of other miners worked with him, and he acted as the fireboss for the work area.  However, Mr. Ellis stated that he was not responsible for firebossing the section of the track where he was injured.  A member of the union Safety Committee explained that the area where Mr. Ellis was injured is not travelled

3

regularly, even by inspectors, and is not generally part of safety checks performed jointly by the union and mine management. Mr. Ellis was usually a passenger on the trip to the work site, and a miner who had worked at Pinnacle longer usually drove. On August 3, 2013, Ronnie Walters drove a jeep (a small, open mantrip), and Mr. Ellis was the only passenger.

The height of the mine roof changed from more than six feet to somewhat over four feet over a distance of between seventy and ninety feet, approaching Break 142. Mr. Ellis thought he heard a noise like the pole on the mantrip detaching and turned to check. Another miner provided testimony explaining that the pole could swing dangerously when it detached, and finding out where it was would be prudent. There is dispute regarding whether Mr. Ellis rose up in the mantrip or remained in a low, seated position.[2] His forehead hit a protruding roof bolt, which penetrated his hardhat. The Mine Safety and Health Administration (MSHA) later determined that Mr. Ellis' hardhat did not meet required standards. The parties dispute whose responsibility it was to ensure that miners' hardhats were compliant, as well as whether the non-compliant hardhat contributed to the severity of Mr. Ellis' injuries. Mr. Ellis was wearing a hardhat he had purchased from a fellow miner at a different mine sometime in the late 1990s. About a week before the incident at issue here, he had struck his head on a roof bolt and cracked another hardhat, which was identical except for color. He took the hardhat he was wearing at the time of the August 3 accident to someone in the safety department to have a tracking signal installed after the prior incident, which was less than one week before his August 3 injury.

---

2 Some medical records suggest that, in describing the accident in the hours after it took place, Mr. Ellis said he rose up to grab the pole. Mr. Ellis denies that he said that and maintains that he remained in a low position. The parties conducted a site inspection wherein they took measurements of the mantrip and the location of the accident, but dispute exactly what those measurements indicate (i.e., whether it was twenty-eight inches from the seat of the mantrip to the mine roof, or from the top of the seatback to the mine roof). Thus, although the measurements and whether someone of Mr. Ellis's height would make contact with the mine roof while in a seated position on the mantrip should be readily verifiable, it remains the subject of dispute for purposes of the instant motions for summary judgment.

The parties also dispute whether the change in clearance is properly considered "abrupt," for the purposes of regulations requiring warning signs or reflectors when there is an abrupt change. However, several members of management stated that they were familiar with the area, that "everyone knew" there was a low top there, and that they believed there were signs warning of the decrease in roof height. For example, Dave Meadows, then the Safety Manager for Pinnacle, agreed that "before Mr. Ellis got hurt, the mine recognized that there was descending roof in that entry between the sizer and down the slope and that it was necessary to put up those reflectors to warn miners of the changes in overhead clearance." (Meadows Depo. at 37::1-5) (Document 104-4.) He indicated, however, that he did not believe there was a problem with the signage at Break 142 because the area had been travelled for thirty years without incident and without citation, to the best of his recollection. Bill Kissinger, the evening shift foreman, likewise agreed that "if the area goes from seven feet to four feet…in the 100 feet approaching where Mr. Ellis was injured, there should have been a sign or reflector." (Kissinger Depo at 42::11-14) (Document 104-10). He also indicated that a change in roof height over one hundred feet would not be abrupt, but that if there was not a sign warning of the low clearance, there should have been. Mr. Kissinger stated that it was a mine wide policy that miners should stay low while travelling in mantrips. He could not recall any citations regarding the roof height or the lack of warning signs at Break 142.

Several miners testified that there was an abrupt change in overhead clearance without appropriate signs or warning indicators in the area where Mr. Ellis was injured. They also indicated that there had been previous incidents in which miners struck or grazed their heads in that area, though without significant injury, and that those incidents were discussed in safety

5

meetings by members of management. None of the miners had discussed the dangers presented by the low roof and lack of warning signs with management, although they may have complained amongst themselves. Some miners, including Mr. Walters, the mantrip driver on August 3, stated that they were not familiar with a track haulage policy for the mine and no such policy had been distributed. The miners and the members of management all indicated that warning signs were necessary when there were abrupt changes in clearance because of the risk of miners hitting their heads and being seriously injured or killed.

Pinnacle filed its motion for summary judgment on November 23, 2016, and the Plaintiff filed his on November 28, 2016. The Plaintiffs responded to Pinnacle's motion on December 12, 2016, and Pinnacle responded to the Plaintiff's motion on December 14, 2016. Pinnacle filed a reply in support of its motion on December 19, 2016. The Plaintiff did not file a reply on his own motion, but seeks to file a surreply to Pinnacle's motion. The motions are fully briefed and ripe for the Court's consideration.

## STANDARD OF REVIEW

The well-established standard in consideration of a motion for summary judgment is that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). A "material fact" is a fact that could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). A "genuine issue" concerning

a material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013); *News & Observer*, 597 F.3d at 576.

The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23. When determining whether summary judgment is appropriate, a court must view all of the factual evidence, and any reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. *Hoschar*, 739 F.3d at 169. However, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. "At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action." *Perry v. Kappos*, No.11-1476, 2012 WL 2130908, at *3 (4th Cir. June 13, 2012) (unpublished decision) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249, nor will it make determinations of credibility. *N. Am. Precast, Inc. v. Gen. Cas. Co. of Wis.*, 2008 WL 906334, *3 (S.D. W. Va. Mar. 31, 2008) (Copenhaver, J.) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). If disputes over a material fact exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson*, 477 U.S. at 250. If, however, the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case," then summary judgment should be

7

granted because "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23.

When presented with motions for summary judgment from both parties, courts apply the same standard of review. *Tastee Treats, Inc. v. U.S. Fid. & Guar. Co.*, 2008 WL 2836701 (S.D. W. Va. July 21, 2008) (Johnston, J.) *aff'd*, 474 F. App'x 101 (4th Cir. 2012). Courts "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," resolving factual disputes and drawing inferences for the non-moving party as to each motion. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted); *see also Monumental Paving & Excavating, Inc. v. Pennsylvania Manufacturers' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999).

## APPLICABLE LAW

"West Virginia law expressly provides an exemption from employee civil liability claims for work-related injuries to employers who are in good standing with the Workers' Compensation laws of the state W. Va. Code § 23-2-6 (1991)." *Sedgmer v. McElroy Coal Co.*, 640 S.E.2d 129, 132 (W. Va. 2006) (per curiam.) "The Legislature also expressly provided that this immunity is not absolute in the area of "deliberate intention" injuries, setting forth mandatory requirements at [W. Va. Code § 23-4-2(d)], which must be met before an employer's immunity is lost and an employee may recover outside the workers' compensation system." *Id.* at 133.

W. Va. Code § 23-4-2(d)(ii) sets forth the five elements that a Plaintiff must prove to establish a deliberate intent cause of action:

    (A)    That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;

    (B)    That the employer, prior to the injury, had actual knowledge of the existence of the specific unsafe working condition and the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition;

    (C)    That the specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer, as demonstrated by competent evidence of written standards or guidelines which reflect a consensus safety standard in the industry or business, which statute, rule, regulation or standard was specifically applicable to the particular work and working condition involved, as contrasted with a statute, rule, regulation or standard generally requiring safe workplaces, equipment or working conditions;

    (D)    That notwithstanding the existence of the facts set forth in subparagraphs (A) through (C), inclusive, of this paragraph, the employer nevertheless intentionally thereafter exposed an employee to the specific unsafe working condition; and

    (E)    That the employee exposed suffered serious compensable injury or compensable death . . . as a direct and proximate result of the specific unsafe working condition.

W. Va. Code § 23-4-2(d)(ii)(A)-(E).[3]

Proximate cause is "that cause which in actual sequence, unbroken by any independent cause, produces the event and without which the event would not have occurred." *Skaggs v. Kroger Co./Kroger Ltd. P'ship I*, 788 F. Supp. 2d 501, 510 (S.D.W. Va. 2011) (quoting *Johnson v. Mays,* 447 S.E.2d 563, 568 (W. Va. 1994) (Copenhaver, J.) Where there is conflicting

---

3 West Virginia's deliberate intent statute was amended effective June 12, 2015. The parties have cited, and the Court has applied, the version of the statute effective prior to that date.

evidence, or the undisputed evidence permits conflicting interpretations, proximate cause is a question for the jury. *Id.* However, the West Virginia Supreme Court of Appeals has held that employers may not assert an employee's contributory negligence as a defense in deliberate intent actions. Syl. Pt. 8, *Roberts v. Consolidation Coal Co.*, 539 S.E.2d 478, 483 (W. Va. 2000). In any case "where an employee creates a specific unsafe working condition by not following expected procedure, a deliberate intention action cannot be maintained against the employer." *Mumaw v. U.S. Silica Co.*, 511 S.E.2d 117, 123 (W. Va. 1998) (after hoisting a piece of equipment through a trapdoor, the employee responsible for closing the trapdoor failed to do so and fell).

## DISCUSSION

### A. Surreply

As an initial matter, the Court finds that the Plaintiff's motion to file a surreply should be denied. To the extent Pinnacle's reply brief contained new arguments or raised new issues, the Court will disregard those arguments and issues. The proposed surreply largely reiterates previous arguments regarding whether Mr. Ellis raised up at the time of the accident. The facts and evidence supporting each party's position were presented in the initial briefing, and, therefore, the Court finds that no surreply is necessary.

### B. Deliberate Intent

Pinnacle argues that Mr. Ellis was injured only because he rose up to grab the trolley pole, in violation of Pinnacle's training. Thus, Pinnacle asserts, the proximate cause of Mr. Ellis' injury was his own unsafe behavior, rather than the lack of signs and reflectors warning of the low roof at Break 142. Any unsafe condition was created by the Plaintiff, according to Pinnacle. Pinnacle stresses that the low clearance around Break 142 has not resulted in either citations or reportable

10

incidents similar to Mr. Ellis' accident in the approximate thirty years the haulage road has been in use. Therefore, Pinnacle argues, "if Break 142 presented a *high* degree of risk and a *strong* probability of serious injury…someone else would have been seriously injured in the 30 years the area has existed." (Pinnacle Mem. in Supp. of Summary J. at 14) (emphasis in original). In addition, Pinnacle asserts that there is no evidence that Mr. Ellis' hardhat provided deficient protection or that any deficiency contributed to his spinal injury, and that even if it did, miners were responsible for procuring their own approved hardhats. Pinnacle argues that Mr. Ellis has not made a *prima facie* showing for each of the five elements required to prove deliberate intent, and seeks summary judgment.

Mr. Ellis relies on the affidavits and depositions, from miners and management alike, indicating that there was an abrupt change in clearance at Break 142, that warning signs or reflectors should have been posted in the area, and that the low roof presented a risk of serious injury or death. Mr. Ellis further stresses that there had been prior incidents that did not result in serious injuries, but did prompt management to discuss the area during safety huddles, indicating knowledge of the unsafe condition. He maintains that he did not raise up, and asserts that "comparative fault is barred and assuming Mr. Ellis 'raised up,' 'raising up' is the precise action that warning signs are intended to prevent." (Pl.'s Resp. to Def.'s Mot. for Summary J. at 15.) Because members of management admitted that the area was low, that warning signs were required, and that miners could be seriously injured or killed by striking their heads on the low roof, Mr. Ellis asserts that he is entitled to summary judgment.

The Court finds that the bar against deliberate intent actions when the injured employee created the unsafe condition is not applicable. First, there is a factual dispute regarding whether

11

Mr. Ellis raised up or remained seated. More importantly, however, the "unsafe condition" at issue is the lack of warning signs or reflectors at an area with rapidly decreasing clearance. Mr. Ellis did not create the low clearance, nor did he fail to post warning signs or reflectors. Therefore, Mr. Ellis cannot be said to have created the unsafe condition by raising up to hit his head. As Pinnacle managers recognized, indicators of low clearance are required precisely to alert miners of the need to take extra care to remain low and avoid hitting their heads on the roof.

The Court finds that Mr. Ellis has made a prima facie case as to each element, precluding summary judgment in favor of the Defendant, but that issues of fact bar summary judgment in favor of Mr. Ellis. There was testimony from miners and from Mr. Meadows and Mr. Kissinger that would permit a reasonable juror to conclude that the lack of warning signs or reflectors at Break 142 constituted an unsafe working condition presenting a high degree of risk and a strong probability of serious injury or death. A jury could conclude that Pinnacle had actual knowledge of the condition and the risks it presented based on (a) testimony from managers that they knew it was low, (b) managers' observation of the long-standing condition during their travel in the area, and (c) testimony that managers mentioned the area during pre-shift safety meetings after prior incidents of miners hitting or grazing their heads in the same area. Likewise, there was testimony indicating that the decrease in clearance at Break 142 was abrupt, and regulations require signs or reflectors to mark abrupt changes in clearance. Mr. Ellis was directed to work in an area that required him to travel through Break 142. A jury finding that Pinnacle had knowledge of the risks posed by the lack of warning signs or reflectors could find that Pinnacle intentionally exposed Mr. Ellis to the unmarked low clearance at Break 142. Finally, there is no dispute that Mr. Ellis

suffered serious compensable injuries. A reasonable jury could conclude that the lack of warning signs proximately caused his injuries. Thus, Pinnacle is not entitled to summary judgment.

However, a reasonable jury could also conclude that the change in clearance at Break 142 was not "abrupt" within the meaning of the regulations, as Pinnacle's expert contends, or that the area did not present a high degree of risk and a strong probability of serious injury or death, given the absence of citations or serious previous incidents. A reasonable jury could find that Pinnacle, having trained employees to remain low in the mantrip at all times, did not intentionally expose Mr. Ellis to the unsafe condition. Or a jury could conclude that the lack of signs or reflectors did not proximately cause Mr. Ellis's injuries. Thus, Mr. Ellis is not entitled to summary judgment as to deliberate intent.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *Defendant Pinnacle Mining Company, LLC's Motion for Summary Judgment* (Document 94) and the *Plaintiffs' Motion for Partial Summary Judgment on the Issue of Liability for Deliberate Intent* (Document 102) be **DENIED**. In addition, the Court **ORDERS** that the *Motion for Leave to File Surreply in Opposition to Pinnacle Mining Company, LLC's Motion for Summary Judgment* (Document 151) be **DENIED**.

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record and to any unrepresented party.

ENTER: January 11, 2017

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA